**Certiorari Denied, June 19, 2012, No. 33,645**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-074**

**Filing Date: May 10, 2012**

**Docket No. 30,577**

**CLOYD G. HINKLE,**

> **Plaintiff-Appellant,**

**v.**

**DOROTHY M. ABEITA,**

> **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Valerie A. Mackie Huling, District Judge**

Hinkle Law Offices, P.C.,
Cynthia A. Braun
Albuquerque, NM

for Appellant

Miller Stratvert P.A.
H. Brook Laskey
Shona Zimmerman-Burnett
Albuquerque, NM

for Appellee

## OPINION

**HANISEE, Judge.**

**{1}** In this appeal, we are asked to reconsider whether our state courts have subject matter jurisdiction over tort claims filed against Indian defendants for conduct occurring on state highways within Indian country. Although binding precedent holds that our state courts do not have jurisdiction over such matters, *see Hartley v. Baca*, 97 N.M. 441, 442-43, 640

P.2d 941, 942-43 (Ct. App. 1981), we revisit the issue to determine whether evolving federal Indian Law jurisprudence and recent precedent from our own Supreme Court now require a different result. We hold that those developments do not alter our analysis in *Hartley*, and we hereby affirm the district court's decision to dismiss for lack of subject matter jurisdiction.

## I. BACKGROUND

{2}     Cloyd Hinkle, a non-Indian, and Dorothy Abeita, an enrolled member of Isleta Pueblo, were involved in a motor vehicle accident within the exterior boundaries of Isleta Pueblo at the intersection of a state highway and a tribal road. For purposes of this appeal, the parties stipulate that the accident occurred on State Highway 314—a public state right-of-way—at a location which they also agree qualifies as Indian country. Hinkle maintains that as he sought to pass Abeita's slower-moving car while driving his motorcycle on State Highway 314, Abeita abruptly turned left toward a tribal road without signaling, causing Hinkle to "lay his bike down" and collide with her car. Hinkle filed suit in Bernalillo County District Court, claiming that Abeita's negligent driving caused injury to him and damage to his motorcycle. Abeita filed a motion for summary judgment based primarily on this Court's decision in *Hartley*, asserting that the district court lacked subject matter jurisdiction because she was a member of Isleta Pueblo and the accident occurred within the exterior boundaries of the Pueblo. After briefing and a hearing on the motion, the district court agreed with Abeita that it lacked subject matter jurisdiction pursuant to the *Hartley* analysis and dismissed Hinkle's complaint. We now consider Hinkle's appeal from the district court's determination in light of the evolved body of federal Indian Law since our decision in *Hartley*, and our Supreme Court's recent decision in *Garcia v. Gutierrez*, 2009-NMSC-044, 147 N.M. 105, 217 P.3d 591.

## II. STANDARD OF REVIEW

{3}     The lone issue to be resolved is the propriety of the district court's order granting Abeita's motion for summary judgment and dismissing Hinkle's complaint for lack of subject matter jurisdiction. "In reviewing an appeal from an order granting or denying a motion to dismiss for lack of jurisdiction, the determination of whether jurisdiction exists is a question of law which an appellate court reviews de novo." *Gallegos v. Pueblo of Tesuque*, 2002-NMSC-012, ¶¶ 6, 7, 132 N.M. 207, 46 P.3d 668 (determining that New Mexico courts lacked subject matter jurisdiction over a tort action brought by a non-Indian against an Indian tribe). Likewise, "[a]n appeal from the grant of a motion for summary judgment presents a question of law and is reviewed de novo." *Cable v. Wells Fargo Bank N.M., N.A.*, 2010-NMSC-017, ¶ 9, 148 N.M. 127, 231 P.3d 108 (internal quotation marks and citation omitted).

## III. DISCUSSION

{4}     Over thirty years ago in *Hartley*, this Court resolved the exact legal issue raised in

this case on nearly identical facts. 97 N.M. at 442, 640 P.2d at 942. Then, a non-Indian motorcyclist filed a personal injury action in state court against a pueblo-member motorist. *Id.* The underlying accident also occurred on a state highway within the exterior boundaries of an Indian pueblo. *Id.* And as in the case at bar, the district court in *Hartley* dismissed for lack of subject matter jurisdiction. *Id.* This Court affirmed that dismissal based on the "infringement test" established in *Williams v. Lee*, 358 U.S. 217, 220 (1959), which it cited as follows: The question of whether states have subject matter jurisdiction, absent governing acts of Congress, "has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Hartley*, 97 N.M. at 443, 640 P.2d at 943 (internal quotation marks and citation omitted). The infringement test was established in recognition of the fact that the states generally do not have power to regulate the property or conduct of tribes or tribal members within Indian country because Indian tribes and pueblos retain aspects of the inherent sovereignty they possessed prior to becoming subject to the authority of the federal government. *See generally* Felix S. Cohen, *Cohen's Handbook of Federal Indian Law* § 6.03 (Nell Jessup Newton ed. 2005).

**{5}**     In *Hartley*, this Court enumerated the criteria relevant to the infringement test: "(1) whether the parties are Indians or non-Indians; (2) whether the cause of action arose within the Indian reservation; and (3) the nature of the interest to be protected." 97 N.M. at 443, 640 P.2d at 943 (citing *Chino v. Chino*, 90 N.M. 203, 206, 561 P.2d 476, 479 (1977)). Upon considering the *Williams* criteria, this Court concluded that state jurisdiction over the civil tort claim "would run afoul of the infringement test," because (1) "[the defendant] was an Indian," (2) "the accident occurred on State Road 30 within the exterior boundaries of the Santa Clara Pueblo," and (3) "the nature of the interest to be protected [was] the right of [the member defendant] to be heard in the Santa Clara Tribal Court under its tribal laws." *Hartley*, 97 N.M. at 443, 640 P.2d at 943 (internal quotation marks omitted).

**{6}**     Hinkle concedes in his briefing to our Court that *Hartley* stands as binding precedent over these facts—and if it remains good law would compel our state courts to dismiss his and other factually similar actions for lack of jurisdiction. Nonetheless, he argues that since this Court decided *Hartley* in 1981, federal precedent—beginning with *Montana v. United States*, 450 U.S. 544 (1981)—has fundamentally altered the analysis used in *Hartley* and applied stricter limitations to the reach of tribal jurisdiction. Accordingly, Hinkle urges us to reconsider our holding in *Hartley* and utilize the *Montana* rule—in place of the infringement test—to now allow state court jurisdiction over his claim against Abeita. While we disagree with the legal conclusions that Hinkle would have us adopt, we accept the opportunity to explain the impact of *Montana* and its progeny on our own state-court jurisdictional analysis. In doing so, we reaffirm both our reliance on the infringement test articulated over half a century ago in *Williams*, as well as our "venerable tradition of defer[ence]" to tribal sovereignty, *State v. Harrison*, 2010-NMSC-038, ¶ 27, 148 N.M. 500, 238 P.3d 869, particularly where the exercise of that sovereignty concerns tribal authority over the conduct of its own members in Indian country. *See Found. Reserve Ins. Co. v. Garcia*, 105 N.M. 514, 516, 734 P.2d 754, 756 (1987) ("Exclusive tribal jurisdiction exists . . . when an Indian is being sued by a non-Indian over an occurrence or transaction arising

3

in Indian country . . . .").

{7}     Hinkle initially suggests that this Court overlooked or was unaware of *Montana* when it decided *Hartley* because *Montana* was very recent precedent at the time and was not referenced within the *Hartley* opinion.  As a matter of chronology, the United States Supreme Court decided *Montana* three months prior to this Court's opinion in *Hartley*.  We do not read the dispositional proximity, or this Court's silence on the topic, as meaning anything more than that this Court viewed the *Montana* analysis as distinct from that needed to resolve the state jurisdictional issue in *Hartley*.  *Montana* itself cautions that it addresses only a "[narrow] regulatory issue:"  Did the Crow Tribe have "the power . . . to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe"?  450 U.S. at  557.  That issue was raised in the context of tribal, not state jurisdiction.  Furthermore, nearly six years after *Montana* became law, our New Mexico Supreme Court expressed its approval of *Hartley*'s outcome and analysis.  *Found. Reserve*, 105 N.M. at 515, 734 P.2d at 755 ("The Court of Appeals [in *Hartley*], applying the infringement test, properly affirmed the district court's dismissal of the action for lack of subject matter jurisdiction.").

{8}     Although we reject the assumption that this Court was oblivious of *Montana* when it applied the infringement test in *Hartley*, or that our New Mexico Supreme Court mistakenly ignored *Montana* when it later approved that analysis in *Foundation Reserve*, we nevertheless agree that *Hartley* now warrants review.  Though *Montana* did not itself announce a rule necessary for our courts to address in *Hartley* or *Found. Reserve*, subsequent cases expanding the *Montana* rule certainly have done so.  First in 1997, the United States Supreme Court in *Strate v. A-1 Contractors*, 520 U.S. 438, 443, 459 (1997), extended the *Montana* rule to prohibit tribal court jurisdiction over a case arising from a motor vehicle accident involving two nonmembers on a highway within the boundaries of an Indian reservation.  And it did so again in *Nevada v. Hicks*, 533 U.S. 353 (2001), when the Court further expanded the *Montana* rule to forbid a civil lawsuit in tribal court brought by a tribal member against state police officers who executed a search warrant on reservation land.  *Id.* at 358-60, 364-65.  Other cases as well have continued the trend to curtail the exercise of tribal authority over nonmembers.  *See, e.g.*, *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 647 (2001) (barring a tribe's regulatory authority to impose taxes upon non-Indian activity occurring on non-Indian fee land within a reservation).  Moreover, our own New Mexico Supreme Court's recent decision in *Garcia*, when read broadly, invites the argument that the *Montana* analysis is now relevant to the determination of state court jurisdiction.  2009-NMSC-044, ¶¶ 27-34 (discussing the *Montana* line of cases within its determination of state court jurisdiction over a child-custody dispute between a member and nonmember pursuant to the Uniform Child-Custody Jurisdiction Enforcement Act (UCCJEA)).

{9}     We thus address Hinkle's argument that the *Montana* rule, as it has evolved in the course of federal jurisprudence, should supplant the test articulated in *Williams* and applied in *Hartley*.  Adoption of that rule here, Hinkle suggests, would allow our state courts to assert subject matter jurisdiction over accidents occurring on state and federal public

4

highways without consideration of tribal boundaries. Hinkle further maintains that the assertion of state jurisdiction in such circumstances would be publicly beneficial in that it would ensure a consistent venue for accidents on public rights-of-way throughout New Mexico. After consideration of each of the *Montana*-born cases, however, we disagree with Hinkle's analysis for the following reasons: (1) the *Montana* cases were carefully drafted to determine the parameters of *tribal* court jurisdiction, not *state* court jurisdiction, and are therefore legally distinguishable; (2) the common principle among cases that apply the *Montana* rule—that a given tribe exceeded its sovereign powers by exerting jurisdiction over "unconsenting" *nonmembers* of the tribe—is inapplicable to actions filed by nonmembers against tribal members; (3) our courts, as well as federal and state courts across the Country, have continued to rely on *Williams* to determine state court jurisdiction despite the availability of the *Montana* rule; and (4) as a matter of policy, "the courts of this state have adopted greater protection for tribal sovereignty as a matter of state law." *Harrison*, 2010-NMSC-038, ¶ 27.

**The *Montana* Line of Cases Is Limited to Determining Tribal Court Jurisdiction**

**{10}**     Although the *Montana*-derived jurisprudence expansively bars tribal authority over various types of nonmember conduct within tribal boundaries, it is nearly unanimous in its exclusion of that analysis to state court jurisdiction. In fact, the United States Supreme Court in *Montana* and the cases that followed was careful to limit its holdings to the narrow question of tribal court jurisdiction, and has been largely silent as to the separate question of state court jurisdiction. *See, e.g.*, *Montana*, 450 U.S. at 557 (addressing the narrow issue of whether the *Tribe's power* includes the ability to regulate non-Indian recreational activities "on reservation land owned in fee by nonmembers of the Tribe."); *Strate*, 520 U.S. at 442 ("This case concerns the adjudicatory authority of *tribal courts* over personal injury actions against defendants who are not tribal members." (emphasis added)); *Atkinson Trading Co.*, 532 U.S. at 647 ("The question with which we are presented is whether [*Montana*'s] general rule applies to *tribal* attempts to tax nonmember activity occurring on non-Indian fee land." (emphasis added)); *Hicks*, 533 U.S. at 358 n.2 ("Our holding in this case is limited to the question of *tribal-court jurisdiction* over state officers enforcing state law." (emphasis added)); *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 320 (2008) ("The question presented is whether the *Tribal Court* had jurisdiction to adjudicate a discrimination claim concerning the non-Indian bank's sale of fee land it owned." (emphasis added)). Based on the expressly focused holdings in those cases, as well as their collective silence as to any inquiry of alternative jurisdiction, we conclude each is distinguishable from the related but distinct question at bar—state court jurisdiction. We thus decline to extend the *Montana* rule to determinations of the propriety of state court jurisdiction absent a clear directive from the United States Supreme Court or our New Mexico Supreme Court.

**{11}**     Indeed, our decision to narrowly apply the *Montana* rule to only those questions of *tribal* jurisdictional authority enjoys broad support among leading Indian law treatises, as well as courts across the nation. *Cohen's*, *supra*, § 6.03[2][c], at 536-37 (stating that the

5

analysis for tribal court jurisdiction is distinct from the analysis for state court jurisdiction); *Winer v. Penny Enters., Inc.*, 674 N.W.2d 9, 15-16 (N.D. 2004) ("[A]ll of the cases relied upon by [the plaintiff] which have applied the *Strate* analysis have involved situations testing tribal court jurisdiction over non-Indian defendants where the conduct occurred on a right-of-way. We have not found any case wherein the *Strate* analysis has been used to determine whether a state court has jurisdiction over a tort action brought against an Indian arising on a right-of-way within the exterior boundaries of a reservation." (citations omitted)); *State v. Cummings*, 679 N.W.2d 484, 487-88 (S.D. 2004) (refusing to apply the *Hicks* analysis to determine state jurisdiction in Indian land because "[b]y its own terms," *Hicks* constrained its analysis to "[w]hether a *tribal court* may assert jurisdiction over civil claims" (emphasis partially omitted)); *Cossey v. Cherokee Nation Enters., LLC*, 212 P.3d 447, 467 n.1 (Okla. 2009) (determining that the *Montana* "cases are inapplicable" to the jurisdictional propriety of a state tort action brought by a nonmember casino patron against a tribe "because they concern a tribe's or a tribal court's authority over non-Indians," and "[t]he question in this matter is whether the state district court has acquired civil adjudicatory authority."); *but see Zempel v. Liberty*, 143 P.3d 123, 130-34 (Mont. 2006) (determining the Montana district court had subject matter jurisdiction over a tort claim by a nonmember against a tribal member by first applying the *Montana* rule to ascertain tribal jurisdiction).

**{12}**     Our own Court has even limited *Strate*'s application to its express terms in other contexts. *See Williams v. Bd. of Cnty. Comm'rs of San Juan Cnty.*, 1998-NMCA-090, ¶ 17, 125 N.M. 445, 963 P.2d 522 (dismissing the argument, in a case involving a suit of the Navajo Nation in state court, that *Strate* governed the jurisdictional inquiry by stating: "we disagree . . . that the holding in *Strate v. A-1 Contractors* dictates [our conclusion.] *Strate* addressed tribal court jurisdiction [and its decision] was independent of case law holding that Indian nations may not be sued in state courts."); *Halwood v. Cowboy Auto Sales, Inc.*, 1997-NMCA-098, ¶ 15, 124 N.M. 77, 946 P.2d 1088 (declining to apply *Strate* in determining whether a tribal court had jurisdiction to award punitive damages against a non-Indian company because *Strate* expressed no opinion on whether tribal courts lack jurisdiction over nonmember conduct on member-owned reservation land).

**{13}**     We do recognize, as Hinkle argues, that our New Mexico Supreme Court in *Garcia* has recently discussed the principles undergirding the *Montana* line of cases within its determination of state court jurisdiction. 2009-NMSC-044, ¶ 32 ("Although our case addresses state jurisdiction, not tribal jurisdiction, the *Montana* cases nonetheless show that it is not enough merely to conclude that a certain plot of land is, or is not, 'Indian country.'"). But we view the Court's discussion of *Montana* in deciding *Garcia* as consistent with the inherent limitation of the *Montana* rule. There, our New Mexico Supreme Court faced a perplexing child custody dispute between an Indian parent and a non-Indian parent, involving parallel claims filed in both tribal and state court. *Id.* ¶ 2. The central issue concerned the application of the UCCJEA, which has been adopted in some form by all fifty states, and which both defines state jurisdiction over child custody matters and requires the State of New Mexico to treat tribes as a co-equal state. *Id.* ¶¶ 13, 15. While the Court discussed the *Montana* cases at length, it did so only to "answer the narrow

6

question [of] whether the fee land can be considered part of the Pojoaque Pueblo solely for the purpose[] of [ascertaining] the UCCJEA's 'home-state' jurisdiction." *Id.* ¶ 33. Tellingly, it did not utilize *Montana* or its progeny in concluding that state jurisdiction was proper on *Garcia*'s facts. And ultimately, our Supreme Court in *Garcia* expressly reaffirmed "appl[ication of] the infringement test to determine whether the exercise of state authority will compromise the tribal sovereignty recognized in *Williams*." *Id.* ¶ 47. And while *Garcia* notes that "the *Montana* line of cases subsequently narrowed *Williams*, particularly where the issue is tribal authority over non-Indians," it does not encroach upon *Williams* or its seminal methodology to identify restrictions on *state* jurisdictional reach. *Id.* The Court simply applied the long-standing infringement analysis under the unique facts presented, incorporated the added nuances of UCCJEA application and jurisdictionally concurrent litigation involving minor children, and determined that state court jurisdiction under those circumstances would not impermissibly infringe upon tribal authority under *Williams*. We therefore do not read *Garcia* as importing the *Montana* rule into determinations of state court jurisdiction or as supplanting the infringement test.

**The Montana Rule Applies Only When the Unconsenting Party Is a Nonmember**

**{14}** Even were we to attempt to import the *Montana* analysis in resolving the question of state jurisdiction in the manner Hinkle suggests, it would not be to his benefit because the result in each of the *Montana* cases turned on the key fact that the "unconsenting part[ies]" to tribal authority were *all* nonmembers. *Hicks*, 533 U.S. at 382 (Souter, J., concurring) ("It is the membership status of the unconsenting party, not the status of real property, that counts as the primary jurisdictional fact."); *Smith v. Salish Kootenai Coll.*, 434 F.3d 1127, 1131 (9th Cir. 2006) ("The Court has repeatedly demonstrated its concern that tribal courts not require '*defendants who are not tribal members*' to 'defend [themselves against ordinary claims] in an unfamiliar court.'" (quoting *Strate*, 520 U.S. at 442, 459) (alteration in original) (emphasis added)); *Montana*, 450 U.S. at 564 (barring tribal authority over conduct of "nonmembers of a tribe on lands no longer owned by the tribe"); *Atkinson Trading Co.*, 532 U.S. at 647, 659 (determining no tribal jurisdiction exists over civil-rights claim by Indian against *non-Indian defendants*); *Plains Commerce Bank*, 554 U.S. at 330-41 (holding that a tribal court lacked subject matter jurisdiction over a suit by an Indian plaintiff *against a non-Indian defendant* for conduct involving the sale of fee land within Indian country). The principle concern in each of those cases was Indian jurisdiction over the conduct of unconsenting nonmembers. Here, the conduct sought to be regulated is that of an unconsenting tribal member. And if fidelity to the construct of separate sovereigns—state or tribal—is to be maintained in a manner that is congruent, the same concern must be articulated when an action involves the application of state court jurisdiction to an unconsenting tribal member.

**{15}** Furthermore, were this case to be filed in tribal court, Abeita—the tribal member—and not Hinkle, would be called to answer for her conduct. Hinkle's presence in tribal court can be secured only by his own volition, which would then exclude his status as an unconsenting party to the suit. These facts are not rendered legally meaningless simply

7

because the jurisdiction available to Hinkle does not include his preference for state court. *See Williams*, 358 U.S. at 218 (recognizing that nonmember plaintiffs can be made to file their claims in tribal court when the state's exercise of jurisdiction would impinge tribal sovereignty). Similarly, tribal member plaintiffs sacrifice their status as unconsenting parties in state court by electing to proceed away from their preferred tribal court based upon its absence of jurisdiction over the nonmember defendant. *Cf. Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g*, 467 U.S. 138, 148 (1984) (recognizing that Indian plaintiffs may elect to file their claims in state courts against non-Indian defendants for causes of action arising in Indian country when tribal courts lack jurisdiction). Thus, under the *Montana* analysis, this action would survive jurisdictional scrutiny if filed in tribal court by Hinkle because the conduct to be regulated is that of a tribal member.

**{16}**    Indeed, it is well settled that where the conduct to be regulated is that of a tribal member on non-Indian fee land within the tribe's exterior boundaries, tribal authority is near its apogee—being eclipsed only when such conduct occurs on tribal-owned land within those boundaries. *See Cohen's*, *supra*, § 7.02[1][a], at 599 (recognizing that tribal courts have exclusive jurisdiction over civil matters where both parties are Indian because those actions are "first and foremost a matter of internal tribal law."); William C. Canby, Jr., *American Indian Law in a Nutshell* 224-26 (4th ed. 2004) (stating that when a non-Indian plaintiff sues an Indian defendant for conduct arising in Indian country, the tribe also has exclusive jurisdiction); *Montana*, 450 U.S. at 564 (recognizing the tribes' inherent power over actions "involv[ing] *only the relations among members of a tribe*" (internal quotation marks and citation omitted)); *Strate*, 520 U.S. at 459 ("Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members . . . ." (alterations in original) (internal quotation marks and citation omitted)); *Tempest Recovery Servs., Inc. v. Belone*, 2003-NMSC-019, ¶ 14, 134 N.M. 133, 74 P.3d 67 ("Exclusive tribal jurisdiction exists where an action involves a proprietary interest in Indian land; or when an Indian sues another Indian on a claim for relief recognized only by tribal custom and law; or when an Indian is being sued by a non-Indian over an occurrence or transaction arising in Indian country." (quoting *Found. Reserve*, 105 N.M. at 516, 734 P.2d at 756) (internal quotation marks omitted)). Therefore, we cannot accept the conclusion Hinkle draws—that the tribal court would not have jurisdiction over Hinkle's action were it to have been filed in tribal court—because it is based on a misunderstanding of the *Montana* cases as applied to these facts.

**{17}**    Hinkle argues that "[f]rom these cases, we can extrapolate a general trend in favor of subject matter jurisdiction in state court, and against tribal court, where the cause of action involves activities of a non-tribal member on fee land within the exterior boundaries of tribal land." Implicit in this argument is the assumption that (1) we should supplant our reliance on the infringement test with the *Montana* analysis in determining state court jurisdiction; and (2) when gaps in tribal court jurisdiction exist, state court jurisdiction must necessarily fill the void. We disagree with both implications and reject Hinkle's argument.

**{18}**     First, we refuse to supplant the infringement test with the *Montana* analysis, not only because we determine that the *Montana* rule is inapplicable to questions of state jurisdiction, as well as to actions filed against tribal members based upon their conduct within Indian country, but because our New Mexico courts, alongside courts nationwide, have continued to rely on *Williams* since the publication of *Montana* and its progeny. *Garcia*, 2009-NMSC-044, ¶ 47 ("[W]e continue to apply the infringement test to determine whether the exercise of state authority will compromise the tribal sovereignty recognized in *Williams*."); *Tempest Recovery Servs., Inc.*, 2003-NMSC-019, ¶ 14 ("We have adopted the 'infringement test' developed from *Williams*, the seminal Supreme Court case addressing a state court's jurisdiction over causes of action involving Indian matters."); *Found. Reserve*, 105 N.M. at 515, 734 P.2d at 755 ("The test for determining whether a state court has jurisdiction over causes of action involving Indian matters is set forth in *Williams*."); Robert L. Lucero, Jr., *State v. Romero: The Legacy of Pueblo Land Grants and The Contours of Jurisdiction in Indian Country*, 37 N.M. L. Rev. 671, 684 (2007) ("Th[e] 'infringement' test from *Williams* has become the standard for determining whether a state exercise of adjudicatory civil jurisdiction is permissible."); *Winer*, 674 N.W.2d at 16 ("If *Strate* signals a drastic departure from the state court jurisdictional principles enunciated in *Williams v. Lee* and its progeny, it is well hidden in the *Strate* decision.").

**{19}**     Second, we do not agree that where tribal court jurisdiction has been denounced, our state courts must necessarily assume jurisdiction.

> It would be a mistake to assume . . . that every situation in which tribal jurisdiction is lacking warrants a finding of state authority. . . . [W]hen there is no tribal jurisdiction under . . . *Montana*, it is possible that application of the [infringement] test may preclude state authority, resulting in a jurisdictional vacuum. If this proves to be the situation, Congress could fix the problem by enacting legislation that extends federal jurisdiction over such matters, delegates responsibility to the states, or assigns jurisdiction to the tribes.

*Cohen's*, *supra*, § 6.03[2][c], at 536-57. Nor should our courts engage in determining tribal court jurisdiction. *Garcia*, 2009-NMSC-044, ¶ 62 ("It is not for us as a state court to say whether the Pojoaque Pueblo, subject to the plenary power of Congress, has jurisdiction."); *accord Astorga v. Wing*, 118 P.3d 1103, 1106 (Ariz. Ct. App. 2005) (stating that, unlike federal courts, state courts do not have authority to review a tribal court's exercise of jurisdiction over nonmembers). In sum, the balance between state and tribal causes of action is not a jurisdictional see-saw, rising and falling in balanced harmony. Rather, determinations of jurisdictional propriety derive from larger notions of shared autonomy, co-existent sovereignty, and the sometimes overlapping boundaries of governmental authority—both geographic and with respect to tribal membership and property ownership. *C.f. Garcia*, 2009-NMSC-044, ¶¶ 3, 27, 35 (recognizing the possibility of non-exclusive concurrent state and tribal jurisdiction, exclusive state jurisdiction, and exclusive tribal jurisdiction, depending on the circumstances); *see Black's Law Dictionary* 727-28 (9th ed.

9

2009) (defining "jurisdiction" as "[a] geographic area within which political or judicial authority may be exercised"). As our Supreme Court has recently noted, it is Congress's role to adjust the fulcrum between state and tribal jurisdiction where neither side can rise to assume jurisdiction as a result of the application of either *Montana* or *Williams*. *See Garcia*, 2009-NMSC-044, ¶ 1 ("There are occasions, and this is one, when this Court can give no definitive answer to the increasingly complex jurisdictional disputes between state and tribal courts. Given its plenary authority over Indian matters, Congress could provide such answers, but it has not.").

**Our Courts Offer Greater Protection for Tribal Sovereignty Under State Law**

{20}    Finally, we refuse to read the *Montana* line of cases as a repudiation of tribal sovereignty. *See Hicks*, 533 U.S. at 371 ("*Self-*government and *internal* relations are not directly at issue here, since the issue is whether the Tribes' law will apply, not to their own members, but to a narrow category of outsiders."). Rather, we read those cases as recognizing, as a matter of federal law, the necessary limits of tribal authority in light of the tribes' status as dependent nations. *Montana*, 450 U.S. at 564 ("[I]n addition to the power to punish tribal offenders, the Indian tribes retain their inherent power[s] . . . . But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes . . . ."). With very specific and narrow exceptions, tribes have not historically exercised authority beyond their geographic boundaries or over the conduct of nonmembers of the tribe. *Hicks*, 533 U.S. at 382 (stating that "[l]imiting tribal-court civil jurisdiction [over nonmember defendants] not only applies the animating principle behind our precedents, but fits with historical assumptions about tribal authority" and tracing the history back through the early nineteenth century as support). In contrast to that historical limit, inherent tribal authority has consistently been recognized as including the ability to regulate the conduct of tribal members, especially when the conduct occurs within tribal boundaries. *Montana*, 450 U.S. at 563 ("Indian tribes are 'unique aggregations possessing attributes of sovereignty over both their members and their territory . . . .'" (citation omitted)); *Doe v. Santa Clara Pueblo*, 2007-NMSC-008, ¶ 18, 141 N.M. 269, 154 P.3d 1644 ("[A]s a general proposition of Indian law[,] derived from the sovereign status of Indian tribes, tribal courts have exclusive jurisdiction over claims arising on tribal lands against tribes, tribal members, or tribal entities.").

{21}    Applying tribal law to the tortious conduct of tribal members within tribal boundaries has been held to fall under the categories of tribal self-government and internal relations. *Smith*, 434 F.3d at 1140-41 ("The Tribes' system of tort is an important means by which the Tribes regulate the domestic and commercial relations of its members. Tort liability has historically been a means for compensating injured parties and punishing guilty parties for their willful or negligent acts. . . . The Tribes have a strong interest in regulating the conduct of their members; it is part of what it means to be a tribal member. The Tribes plainly have an interest in compensating persons injured by their own . . . .").

**{22}** Simply because our United States Supreme Court has fortified the limitations of *tribal* reach over *nonmember* conduct on tribal land by virtue of the *Montana* cases, there does not exist a corresponding decrease of the inherent aspects of tribal sovereignty, such as jurisdictional authority over tribal members in Indian country. Nor did the *Montana* cases diminish our State's great respect and ongoing deference to the Indian tribes and pueblos situated within New Mexico. As our Supreme Court recently recognized, "New Mexico has a unique and venerable tradition of deferring to a tribal government's exercise of the sovereign power vested in them." *Harrison*, 2010-NMSC-038, ¶ 27 (alteration, internal quotation marks, and citation omitted). We therefore reiterate our reliance on the longstanding infringement test to determine whether state court jurisdiction impinges on tribal sovereignty, even in cases where the *Montana* analysis commands the absence of tribal court jurisdiction. We adhere to this formality not only because we cannot discern any clear signal in federal Indian Law to the contrary, but because "the courts of this state have adopted greater protection for tribal sovereignty as a matter of state law." *Harrison*, 2010-NMSC-038, ¶ 27.

## IV. CONCLUSION

**{23}** Today, we reaffirm our analysis and conclusion in *Hartley*, our reliance on the *Williams* infringement test to determine state court jurisdiction over matters arising in Indian country, as well as our State's venerable respect for tribal sovereignty. Accordingly, we affirm the district court's "Order Granting Defendant's Motion for Summary Judgment" on the grounds that the district court was without subject matter jurisdiction.

**{24}    IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**RODERICK T. KENNEDY, Judge**

**Topic Index for *Hinkle v. Abeita*, Docket No. 30,577**

**APPEAL AND ERROR**
Standard of Review

**JURISDICTION**
Subject Matter

11

**CIVIL PROCEDURE**
Summary Judgment

**INDIAN LAW**
Indian Law, General
Tribal and State Authority and Jurisdiction

**NEGLIGENCE**
Personal Injury